FILED

2012 Oct-24  PM 12:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| HERMAN JOSEPH ZANN, III, | ) | |
| PLAINTIFF, | ) | |
| VS. | ) | 2:11-cv-919-JHH |
| DEPUTY DANIEL R. WHIDBY, | ) | |
| DEFENDANT. | ) | |

## MEMORANDUM OF DECISION

The court has before it the July 18, 2012 Motion (Doc. #25) for Summary Judgment filed by Defendant Deputy Daniel R. Whidby. Pursuant to the court's July 19, 2012 order (Doc. #27), the Motion was deemed submitted, without oral argument, to the court for decision on August 16, 2012. After consideration of the briefs and evidence before the court, the Motion (Doc. #25) is due to be granted in part and denied in part for the reasons stated herein.

## I. Procedural History

Plaintiff Herman Joseph Zann III commenced this action on March 10, 2011 by filing in this court a Complaint (Doc. #1) against Defendants Deputy Daniel R. Whidby and the Jefferson County Sheriff's Department alleging the following:

negligent supervision (Count One); negligent training (Count Two); negligent retention (Count Three); use of excessive force (Count Four); false arrest (Count Five); violation of 42 U.S.C. § 1985 (Count Six); state law assault and battery (Count Seven); negligence (Count Nine[1]); and tort of outrage (Count Ten) against the Jefferson County Sheriff's Department, Deputy Daniel Whidby (individually and in his capacity as an officer of the Jefferson County Sheriff's Department), and fictitious defendants A-E.[2]   According to the Complaint, the claims are "secured by the provisions of 42 U.S.C. § 1983" and include supplemental state law torts.  (See Compl. ¶ 6.)   Plaintiff Zann seeks damages allegedly suffered as a result of Defendants' alleged "willful and malicious conduct." (See Compl. generally; see also Doc. # 15 at 2.)

On June 14, 2011, Defendant Jefferson County Sheriff's Department filed a Motion (Doc. #9) to Dismiss all the claims against it, as the Department is not a legal entity subject to suit or liability under 42 U.S.C. § 1983, Dean v. Barber, 951 F.2d 1210, 1214 (11th Cir. 1992), or under Alabama law, King v. Colbert County, 620 So.2d 623, 626 (Ala. 1993).  The court entered an order (Doc. # 10), stating that it

---

[1] Count Eight is a claim for injunctive relief (Compl. ¶¶ 70-74), which is not a separate claim but a type of damages demanded by Plaintiff.

[2] The court notes that Plaintiff never amended the Complaint tp substitute defendants who are real parties in interest.  As such, the assertion of these "fictitious defendants" are mere surplusage and are disregarded by the court.

intended to dismiss the claims against Defendant Jefferson County Sheriff's Department with prejudice unless Plaintiff showed good cause why it should not. The court never heard from Plaintiff regarding this order, and the court dismissed with prejudice (Doc. # 12) Defendant Jefferson County Sheriff's Department on June 27, 2011.

On July 5, 2011, the remaining Defendant, Deputy Daniel R. Whidby, filed a Motion (Doc. # 13) to Dismiss, In Part. That Motion sought to dismiss (1) all claims asserted against Defendant Whidby in his official capacity; (2) any supervisory liability claims; (3) all state law claims; and (4) all claims for injunctive relief. (Id.) After considering the arguments of the parties, the court granted (Doc. # 17) the Motion (Doc. #13) to Dismiss, In Part, with the only claims remaining in the action being the federal claims asserted against Defendant Whidby in his individual capacity.

On July 18, 2012, Defendant Whidby filed the instant Motion (Doc. # 25) to Dismiss. The Motion contends that there is no genuine issue of material fact and that all of Plaintiff's claims fail as a matter of law. (Id.) Simultaneously filed with the Motions for Summary Judgment, the Defendant also filed a separate brief and

evidence[3] (Doc. # 26) in support of his Motion for Summary Judgment.  On July 9, 2012, Plaintiff filed a brief and evidence[4] (Doc. # 28) in Opposition to the Motion for Summary Judgment.  On August 16, 2012, Defendant filed a brief (Doc. # 29) in reply to Plaintiff's Opposition.  All briefs and evidence have been considered by the court in deciding the instant Motion.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  See id. at 323.  Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by

---

[3] Defendant submitted the following evidence in support of summary judgment: deposition of Herman Joseph Zann III; Zann arrest report; affidavit of Daniel R. Whidby; Zann arrest pictures; Zann court records; Zann medical records.

[4] Plaintiff filed the following evidence in opposition to summary judgment: Sworn Statements of Nathan Zann, Herman Zann, Jr., Cheryl Zann, and Eric Brown.

its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.  See id. at 324.

The substantive law will identify which facts are material and which are irrelevant.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  See id. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991) (en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  See Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes

such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  See Fitzpatrick, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional

evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  See Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts[5]

Deputy Whidby was employed as a Deputy Sheriff with the Jefferson County Sheriff's office during the events at issue in this lawsuit.  (Whidby Aff. ¶ 2.)   At around 3:30 a.m. on April 4, 2009, Deputy Whidby was on patrol in the area of 16th Avenue Northeast in Center Point when he pulled into the parking lot of the Center Point East Apartments, a routine part of his patrol area.  (Id. ¶ 3; Exh. 2 at JSCO 0002.)  Deputy Whidby noticed a blue pick-up truck parked at an improper angle. (Id.)

#### A.  The Encounter and Arrest

At this point in the narrative of events, the stories of Zann and Deputy Whidby diverge pretty dramatically as to what happened after Deputy Whidby pulled into the parting lot.  The court divides the narrative of facts into two separate versions,

---

[5] If the facts are in dispute, they are stated in a manner most favor to the non-movant.  See Fitzpatrick, 2 F.3d at 1115.

keeping in mind that where they are different, the court accepts Zann's version as true for purposes of summary judgment.

### 1. Zann's Version of Events

According to Zann, he first saw the patrol car as he was "walking from [his] . . . truck into the middle of the parking lot, halfway to [his] apartment." (Zann Dep. at 32; see also id. at 38-39.) Zann[6] testified that he was half way between his truck and the apartment, nowhere near his truck, when Deputy Whidby drove into the parking lot. (Id. at 36, 39.) Deputy Whidby then got out of his patrol car and told Zann to get back to his truck. (Id. at 33, 36-37, 40.) Zann "told him [he] was going inside the house and didn't understand what the situation was," (id. at 33), and that he "didn't understand why [Deputy Whidby] was harassing [him] in the parking lot, that [he] was going in [his] apartment, and didn't understand what was going on basically." (Id. at 40.) At that point, Zann testified that Deputy Whidby "just flew off the handle, kept telling [him] to get to my truck." (Id. at 33.) Zann again "explained to [Deputy Whidby] that [he] was going in [his] house and that [he] wasn't doing anything." (Id.)

Deputy Whidby then asked Zann for his ID and asked if he had any outstanding

---

[6] Zann was working as a repossession agent for Omni Recovery at the time of his arrest. (Zann Dep. at 16-17.)

warrants.  (Id. at 34, 40-41.)  Zann gave Deputy Whidby his ID, and after going to his

patrol car, Deputy Whidby returned the ID to Zann.[7]   (Id. at 34, 40-41, 44.)

Following this interaction, Zann testified that Deputy Whidby persisted in telling him

to go over to his truck.  (Id. at 34, 44, 46.)   Zann again refused to follow this

instruction.  (Id. at 44, 46.)  Then Zann testified that the following occurred:

> He continued to try to get me to go to my vehicle, and I
> made it clear that I didn't understand what was going on.
> It was dark, he didn't have his lights on, and he was
> basically harassing me.  And I explained that to him, I've
> lived here 17 years and never had this problem before.
> And I said, with all due respect, I'm going to go inside my
> apartment now.  He'd already ran my license, there was
> nothing else needed in my opinion. I felt like I was being
> harassed.  And when I decided to go to the apartment that's
> when he started yelling for me to get to my vehicle and his
> eyes went crazy sideways.[8]  And he went to proceed to put
> his hands on me.[9]  And I knew there was nobody out there,
> it was 2 o'clock in the morning, so no lights on.  I didn't
> know what this guy was going to do and I didn't like the
> whole feeling or aura of the situation, and I took off
> running.

---

[7] Zann testified that he was about six to ten feet away from the patrol car at this point. (Zann Dep. at 41.)

[8] Zann explained that, in his opinion, Deputy Whidby "was mad to the point to where because I didn't do what he said he wanted me to do to where his eyes kind of made a crazy twitch.  You know how somebody can kind of get mad at you and it's like they look at you and it's like they can yell or scream so loud that their eyes can get kind of – I don't know, in my opinion it looked like they were just kind of twitching like he was very, very upset."  (Zann Dep. at 46.)

[9] Zann explained that he thought Deputy Whidby was trying to grab him to arrest him. (Zann Dep. at 34, 47.)

(<u>Id.</u> at 45.)

When Officer Whidby tried to grab him, Zann ran to the door of his apartment, with Officer Whidby chasing behind him.  (<u>Id.</u> at 47.)  When Zann was on his way to the door, he felt through his pockets and realized that all he had was his truck key, and not the key to his apartment, which he had left inside his truck.  (<u>Id.</u>)  Zann then ran around the apartment building, back to his truck, retrieved his key, and then ran back to the door to his apartment.  (<u>Id.</u> at 47-48.)  Deputy Whidby was following behind Zann the entire time.  (<u>Id.</u> at 48, 49.)  Zann does not recall Deputy Whidby saying anything to him as he was running, but testified that he was yelling for his parents and for someone to help him.  (<u>Id.</u>)

As Zann returned from the truck to his apartment door, Deputy Whidby met him at the door.  (<u>Id.</u> at 49.)  Zann was putting his key in the door and Deputy Whidby tased him.  (<u>Id.</u> at 49, 51.)  The taser shot out of a gun and hit Zann in the shoulder.  (<u>Id.</u> at 52-53.)  Zann fell to the ground as a result of the shock.  (<u>Id.</u> at 53.)   After he fell to the ground, Zann stated that Deputy Whidby continued to shock him and he "couldn't do anything and was paralyzed."  (<u>Id.</u>)  Zann stated that "[w]hen it would quit doing its tasing he would step back and kick me and wait for the taser to build back up charge . . . .  And I noticed that as soon as the kicking stopped that is when the tasing started back."  (<u>Id.</u> at 55.)  Zann recalls that he was shocked more than

10

twice, but does not recall how many times.  (Id. at 54.)  He stated that he tried to scream, but his body "lock[ed] up" and he could not "really get nothing to happen." (Id.)  Zann testified that he did not try to get up at any time after being tased, stating that "there's no possible way."  (Id. at 57.)

Zann next recalled another officer arriving and talking with Deputy Whidby. (Id.)   According to Zann, the other officer kicked Zann's right arm and elbow and grinded Zann's hand into the pavement with the heel of his shoes.  (Id. at 58.)  Then, Zann "remember[ed] feeling my head get pulled by my scalp and I felt a knee got into my back really hard.  And then my head was yanked back.  And then I remember seeing a can of Mace real close to my eyes.  And I just remember being sprayed repeatedly and basically seemed like till the bottle was gone.[10]  And it went all in my eyes, all in my noes, all in my mouth."[11]  (Id. at 57-58.)

After being sprayed in the face, Zann recalls being instructed to "get up" but he "couldn't really get up because the taser had tased me so many times and the kicking my breaths were really short."  (Id. at 59-60.)  Because he could not get up or walk on his own, (id. at 64), Zann testified that the officers "basically yanked me

---

[10] Zann stated that Deputy Whidby sprayed the substance at Zann's face.  (Id. at 58.)

[11] Zann testified that his parents were at the apartment door trying to stop Deputy Whidby during the encounter.  (Id. at 57.)

up . . . and drug me to the center of the apartment complex in the middle of the parking lot and sat me on the ground and told me that they would call paramedics to look at me." (Id. at 60.)

### 2.  Deputy Whidby's Version of Events

According to Deputy Whidby's testimony, as he pulled into the parking lot, he used the spotlight on his patrol car to illuminate the inside of the truck, and he saw Zann slide down onto the front seat. (Whidby Aff. ¶ 3; Def. Exh. 2 at JSCO 0002.) Deputy Whidby radioed dispatch and began to notify it of the allegedly suspicious vehicle, but Zann[12] exited the truck and started walking towards the patrol car before Deputy Whidby could complete the notification. (Whidby Aff. ¶ 4; Def. Exh. 2 at JSCO 0002.)  As Zann was walking towards Deputy Whidby, Deputy Whidby repeatedly told Zann to stop where he was, and Zann eventually complied. (Id.) Whidby thought that Zann appeared agitated and he recalls that Zann said, "I live here! My mom is the fucking apartment manager! I haven't done anything!" (Def. Exh. 2 at JSCO 0002;Whidby Aff. ¶ 5.)

Deputy Whidby asked for Zann's identification, which Zann provided.  (Zann Dep. at 40; Whidby Aff. ¶ 6.)  Zann told Deputy Whidby that he had consumed "a

---

[12] Whidby testified that Zann weighed about 185 pounds, was muscular, was in good physical shape, and could bench press 275 pounds. (Whidby Aff. ¶ 5; Zann Dep. at 70-72; see also Herman Zann Arrest Pictures, Def. Exh. 4 at JSCO 0013.)

few beers" earlier in the evening, and Deputy Whidby could smell alcohol on Zann. (Zann Dep. at 29; Def. Exh. 2 at JSCO 0003; Whidby Aff. ¶¶ 5-6.)   He thought Zann's speech was slurred and that his eyes were bloodshot and watery.   (Id.) Additionally, Deputy Whidby thought that Zann appeared nervous, and, according to Deputy Whidby, Zann told Deputy Whidby that he had outstanding warrants. (Def. Exh. 2 at JSCO 0003; Whidby Aff.  ¶ 7.)   Deputy Whidby radioed Zann's driver's license information to dispatch.   (Zann Dep. at 41; Def. Exh. 2 at JSCO 0003; Whidby Aff. ¶ 8.)

Zann's physical bearing, indications of intoxication, behavior and admission of outstanding warrants made Deputy Whidby suspicious, and he decided to pat-down Zann for weapons.  (Whidby Aff.  ¶ 8.)  Deputy Whidby got behind Zann and began the pat-down, but before he could complete the pat-down, Zann pushed Deputy Whidby and ran away. (Zann Dep. at 47; Def. Exh. 2 at JSCO 0003; Whidby Aff. ¶ 9.)  Zann ran towards the apartment complex, and Deputy Whidby gave chase after he yelled for Zann to stop and Zann refused to do so. (Zann Dep. at 47-48; Def. Exh. 2 at JSCO 0003; Whidby Aff. ¶¶ 9-10.)  Deputy Whidby recalls that he caught-up to Zann and the two got into a physical altercation, during which Zann attempted to grab Deputy Whidby's gun which was holstered.  (Def. Exh. 2 at JSCO 0003; Whidby Aff. ¶ 10.)  Deputy Whidby disengaged from the physical altercation to prevent the loss

of his gun.  (Id.)

After running towards the apartment complex, Zann ran back to the truck with Deputy Whidby still giving chase.  (Zann Dep. at 47-48; Def. Exh. 2 at JSCO 0003; Whidby Aff. ¶ 11.)  Deputy Whidby saw Zann grab a small item from the truck, and Deputy Whidby thought he saw Zann throw the item into the woods near the parking lot.[13]  (Def. Exh. 2 at JSCO 0003; Whidby Aff. ¶ 11.)  Zann then ran back towards the apartment complex, and Deputy Whidby ran through the parking lot to try and cut-off Zann on the other side of the complex.  (Zann Dep. at 49; Def. Exh. 2 at JCSO 0003; Whidby Aff. ¶ 12.)

Deputy Whidby caught up to Zann when he was trying to enter an apartment unit, and Deputy Whidby did not know if it was Zann's apartment unit or not.  (Zann Dep. at 49; Def. Exh. 2 at JCSO 0003; Whidby Aff. ¶ 13.)  Deputy Whidby fired his Taser at Zann, who went to the ground after the probes struck him and emitted the five-second Taser cycle.   (Def. Exh. 2 at JSCO 0003; Whidby Aff. ¶ 13.)  Deputy Whidby testified that after the first Taser cycle, Zann attempted to get up and tried to grab for Deputy Whidby's leg.  (Id.)  At that point,  Deputy Whidby kicked Zann away and initiated a second five-second Taser cycle.  (Id.)

_____

[13] Deputies later searched the woods and were not able to find the item. (Whidby Aff. ¶ 15; Def. Exh. 2 at JSCO 0003 - JSCO 0004.)

After the second Taser cycle, Deputy Whidby testified that again Zann tried to get up and grab for Deputy Whidby's leg. (Id.) Again, Deputy Whidby kicked Zann away again and initiated a third five-second Taser cycle. (Id.) After the third Taser cycle, Deputy Whidby dropped on top of Zann and sprayed him in the face with Freeze +P spray, a chemical defense spray. (Id.) Deputy Whidby did not initiate a fourth Taser cycle because Zann did not resist after the use of the Freeze +P spray. (Id.) Other Deputies arrived on the scene after Deputy Whidby used the Freeze+P spray and, together, they were able to handcuff Zann. (Def. Exh. 2 at JCSO 0003; Whidby Aff. ¶ 14.) Center Point Fire and Rescue also arrived, and a paramedic removed the Taser probes from Zann and treated both Zann and Deputy Whidby for lacerations. (Id.)

### B.  Events Following the Arrest

After the paramedics examined them, Zann was placed in the back seat of the police car. (Zann Dep. at 64.) Zann was taken to the Jefferson County Jail, and he was photographed at 4:42 a.m., which was approximately an hour after the events surrounding his arrest. (Id. at 66, 69-70; Def. Exh. 4 at JSCO 0013.) The photograph of Zann shows that he has a reddened area on his side and a small laceration under his shoulder. (Def. Exh. 4 at JSCO 0013.) Deputy Whidby was photographed between 3:53 a.m. and 4:16 a.m., which was approximately thirty minutes after the

events surrounding Zann' s arrest.   (Def. Ex. 4 at JSCO 0014- JSCO 0016.)   The

photographs of Deputy Whidby show that his uniform and gun belt are dirty and that

he has a cut on his leg and wrist.   (Id.)   Other than going to the Emergency Room at

St. Vincent's East the day he was released from the Jefferson County Jail, Zann has

not received any medical treatment for the injuries he claims he sustained during the

arrest.   (Zann Dep. at 80-81; see also Def. Exh. 6 at St. Vincent's 0006.)   The St.

Vincent's East records show that Zann had a nondisplaced fracture of his right elbow,

but no other fractures, dislocations, or mal-alignments.[14]   (Def. Exh. 6 at St. Vincent's

0016 – St. Vincent's 0023.)

Zann was charged with disorderly conduct, resisting arrest, and third degree

assault.   (Def. Exh. 2 at JSCO 0001; Whidby Aff. ¶ 17; Def. Exh. 5 at JSCO 0024,

JSCO 0028, JSCO 0032.)   Zann pled guilty to, and paid fines on, the disorderly

conduct charge and the resisting arrest charge. (Zann Dep. at 73-75, 77-78; Def. Exh.

5 at JSCO 0024 - JSCO 0031.)   Zann testified that, although he did plead guilty, he

did so at the instruction of his attorney, and did not fully understand the situation.

(Zann Dep. at 73-78.) Zann was not prosecuted for the charge of third degree assault.

---

[14] Zann returned to work at Omni Recovery several weeks after his arrest; he did office
work when he returned, but he testified that he was capable of doing repossession work.  (Zann
Dep. at 82-83.)

**IV.  Applicable Substantive Law and Analysis**

At the outset, the court notes that Plaintiff abandoned his conspiracy claim under § 1985.  Deputy Whidby moved for summary judgment on this claim (doc. # 26 at 12-13), but Plaintiff did not address Deputy Whidby's arguments in his opposition (doc. #28) to summary judgment.  As such, the court deems this claim abandoned, and summary judgment is due to be granted as to Zann's claim of conspiracy under 42 U.S.C. § 1985.  Therefore, the only claims remaining in this case are Zann's § 1983 claims for false arrest and excessive force.

To succeed on his § 1983 claims, Zann must establish that he suffered a deprivation of rights, privileges, or immunities secured by the Constitution and laws of the United States and that the act or omission causing the deprivation was committed by a person acting under the color of state law.  Holmes v. Crosby, 418 F.3d 1256, 1258 (11th Cir. 2005).  That being said, however, the doctrine of qualified immunity can shield law enforcement officers from liability.  See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Under this doctrine, law enforcement officers are entitled to qualified immunity so long as the alleged civil damages arose from the officers' discharge of their discretionary functions and their conduct "could reasonably have been thought consistent with the rights they are alleged to have violated."  Anderson v. Creighton, 483 U.S. 635, 638 (1987).  Qualified immunity

17

does not provide a mere defense to liability, but rather a complete immunity from suit. Saucier v. Katz, 533 U.S. 194, 200–01 (2001).

To claim qualified immunity, the officer first must show that he was acting within his discretionary authority when the alleged violation occurred. Kesinger v. Herrington, 381 F.3d 1243, 1248 (11th Cir. 2004); Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002). Once this is shown, "the burden shifts to the plaintiff to show that the official is not entitled to qualified immunity." Skop v. City of Atlanta, 485 F.3d 1130, 1137 (11th Cir. 2007). To avoid summary judgment on the basis of qualified immunity, the plaintiff must show that "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004). In Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808 (2009), the Supreme Court recognized that the court need not conduct the qualified immunity analysis in the this exact sequence; rather, the court may now exercise our sound discretion to decide which prong of the inquiry to address first. Pearson, 129 S. Ct. at 818.

It is undisputed that Deputy Whidby was acting pursuant to his discretionary authority when he arrested Zann. Accordingly, the pertinent inquiry is whether the facts, when viewed in the light most favorable to Zann, establish that Deputy Whidby violated a constitutional right. If he did not, then the inquiry is over and the deputy

is entitled to qualified immunity.  <u>Saucier</u>, 533 U.S. at 201.  On the other hand, if he did violate a constitutional right, then the court must determine if the right was "clearly established" at the time of the violation.  <u>Id.</u>

## A.  False Arrest

Zann complains that he suffered a false arrest in violation of the Fourth and Fourteenth Amendments. "Under the Fourth Amendment, an individual has a right to be free from 'unreasonable searches and seizures' . . . . [and] an arrest is a seizure of the person." <u>Skop v. City of Atlanta, Ga.</u>, 485 F.3d 1130, 1137 (11th Cir.2007). The "reasonableness" of a seizure or arrest under the Fourth Amendment turns on the presence or absence of probable cause.  <u>Id.</u>

"A warrantless arrest without probable cause violates the Constitution and provides a basis for a section 1983 claim [,] but [t]he existence of probable cause at the time of arrest . . . constitutes an absolute bar to a section 1983 action for false arrest." <u>Case v. Eslinger</u>, 555 F.3d 1317, 1326-27 (11th Cir. 2009) (citing <u>Kingsland v. City of Miami</u>, 382 F.3d 1220, 1226 (11th Cir. 2004)). "Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." <u>United States v. Gonzalez</u>, 969 F.2d 999, 1002 (11th Cir. 1992).

"[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." <u>Case</u>, 555 F.3d at 1237 (quoting <u>Illinois v. Gates</u>, 462 U.S. 213, 245 n.13 (1983)). "Even 'seemingly innocent activity' can be the basis for probable cause." <u>Id.</u> (citations omitted). "Probable cause does not require overwhelmingly convincing evidence, but only 'reasonably trustworthy information.'" <u>Id.</u> (citations omitted).

Even if the court determines that a constitutional violation occurred because an officer lacked probable cause, the court then must consider whether arguable probable cause existed. "The officer may still be shielded from liability because his actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Hope v. Pelzer</u>, 536 U.S. 730, at 739 (2002). In other words, absent probable cause, an officer is still entitled to qualified immunity if arguable probable cause existed. <u>Lee v. Ferraro</u>, 284, 1188, 1195 (11th Cir. 2002). "It is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable." <u>Anderson v. Creighton</u>, 483 U.S. 635, 641 (1987). Thus, even if the court determines that Deputy Whidby did not in fact have probable cause, the standard to be applied is whether

20

"reasonable officers in the same circumstances and possessing the same knowledge as the Defendant [ ] could have believed that probable cause existed to arrest." Lee, 284 F.3d at 1195 (citations omitted).

### 1. Was there a Constitutional Violation?

Deputy Whidby argues that probable cause existed to arrest Zann, and that the existence of probable cause if an absolute bar to Zann's claim for false arrest.  Deputy Whidby arrested Zann for disorderly conduct, resisting arrest and third degree assault.[15]   Under the facts presented here, in the light most favorable to Zann, Deputy Whidby had at least arguable probable cause to arrest him.  As such, there was no constitutional violation and Deputy Whidby is entitled to qualified immunity on

---

[15] Deputy Whidby emphasizes that Zann pled guilty to the disorderly conduct charge and to the resisting arrest charge, and contends that those convictions to the underlying charge conclusively establishes the existence of probable cause necessary to bar Zann's section 1983 claim for false arrest.  Deputy Whidby cites a Second Circuit case in support of this contention.

The effect of a conviction on the issue of probable cause in a civil setting is anything but etched in stone in the Eleventh Circuit.  In an unpublished opinion, the Eleventh Circuit commented in dicta that "the judicially-recognized fact that [plaintiff] subsequently pled no contest and was adjudicated guilty demonstrates his detention was not unreasonable or unlawful." Hall v. Smith, 170 Fed. App. 105, 108 (11th Cir. 2006).  However, earlier in the history of this Circuit, the Court held that a plaintiff's complaint for false arrest and false imprisonment stated a claim under section 1983 despite the plaintiff's prior conviction of the offense for which he was arrested.  See Greer v. Turner, 603 F.2d 521 (5th Cir. 1979).  Similarly, in Brown v. Edwards, 721 F.2d 1442 (5th Cir. 1984), the Fifth Circuit concluded that the issue of probable cause had not been litigated in the criminal proceeding, and held that the plaintiff's prior guilty plea did not bar his section 1983 action.  Id. at 1448; compare Hinshaw v. Doffer, 785 F.2d 1260, 1266–67 (5th Cir. 1985) (holding that a guilty plea conviction did not bar a subsequent § 1983 action but commenting in dicta that a jury's guilty verdict would constitute a bar).

21

Zann's claim of false arrest under 42 U.S.C. § 1983.

Although Zann argues that merely running from Deputy Whidby was not enough to establish probable cause to arrest him and cites to cases establishing the same (Doc. #28 at 10-13), the facts of this case involve more than Zann running at the mere sight of Officer Whidby. Instead, the two men first encountered each other in a parking lot in the middle of the night, around 3:30 a.m., a very late hour for anyone to be out and about. (Whidby Aff. ¶ 3.) According to both accounts of their initial encounter, Zann and Officer Whidby engaged in a heated conversation - one that could even be described as argumentative - before Zann ran from Deputy Whidby. Additionally, Zann admitted that he had consumed "a few beers" earlier in the night, and Officer Whidby thought that Zann appeared intoxicated. (Zann Dep. at 29; Whidby Aff. ¶¶ 5-6.) Further, Zann testified that when Deputy Whidby approached him and put his hand on Zann, either for a pat down as Deputy Whidby testified or to arrest him as Zann testified, Zann pushed away from Deputy Whidby and ran away. He then led Deputy Whidby on a prolonged chase throughout the apartment complex and parking lot.

Taking these facts in the light most favorable to Zann, Deputy Whidby had arguable probable cause to arrest Zann for disorderly conduct and for resisting

arrest.[16]  Under Alabama law, disorderly conduct occurs when a person engages in "fighting or in violent tumultuous or threatening behavior" or when a person "[m]akes an unreasonable noise."  Ala. Code § 13A-11-7.  Resisting arrest occurs under Alabama law when a person "intentionally prevents or attempts to prevent a peace officer from affecting a lawful arrest of himself."  Ala. Code § 13A-10-41.  Under the standard of arguable probable cause, a "reasonable officers in the same circumstances and possessing the same knowledge as" Deputy Whidby "could have believed that probable cause existed to arrest" Zann for disorderly conduct and for resisting arrest.  Lee, 284 F.3d at 1195 (citations omitted).

Accordingly, the facts, when viewed in the light most favorable to Zann, do not establish that Deputy Whidby violated a constitutional right when he arrest Zann. Therefore, the inquiry is over and Deputy Whidby is entitled to qualified immunity on Zann's claim of false arrest.  Saucier, 533 U.S. at 201.

**B.  Excessive Force**

As with the claim for false arrest, under the qualified immunity standard, the court is obliged to grant qualified immunity to a law enforcement officer unless the plaintiff can demonstrate: first, that the facts when viewed in a light most favorable

---

[16] The facts in the light most favorable to Zann do not support arguable probable cause to arrest Zann for third degree assault.

to the plaintiff establish a constitutional violation; and, second, that the illegality of the officer's actions was "clearly established" at the time of the incident. <u>Pearson,</u> 129 S.Ct. at 815-16, 818. This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1194 (11th Cir. 2002).

## 1. Was there a Constitutional Violation?

The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the right to be free from excessive force during the course of a criminal apprehension. <u>Graham v. Connor</u>, 490 U.S. 386, 394–95 (1989); <u>Mercado v. City of Orlando</u>, 407 F.3d 1152, 1156 (11th Cir. 2005). In an excessive force case arising out of an arrest, whether a constitutional violation occurred is governed by the Fourth Amendment's "objective reasonableness" standard. <u>Brosseau v. Haugen</u>, 543 U.S. 194, 197 (2004) (citations omitted). A genuine "excessive force" claim relates to the manner in which an arrest was carried out, independent of whether law enforcement had the power to arrest. <u>Bashir v. Rockdale County, Ga.</u>, 445 F.3d 1323, 1332 (11th Cir. 2006). To determine whether the use of force is "objectively reasonable," the court must carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against "the countervailing governmental interests at stake" under the facts of the particular case. <u>Graham</u>, 490 U.S. at 396

(internal citations and quotations omitted). The court measures the quantum of force employed against these factors — (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect actively resisted arrest or attempted to evade arrest by flight. Lee, 284 F.3d at 1197–98. Notably, the court considers the officers' actions "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1249 (11th Cir. 2004), recognizing that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396–97.

There is a clear and unmistakable dispute of facts regarding the force used here and the need for that force. Plaintiff's version of events surrounding the force used differs dramatically from Deputy Whidby's version of events. Whether or not the use of the taser in the first instance was necessary, Plaintiff testified that he fell to the ground as a result of the first shock, and that after he fell to the ground, Deputy Whidby continued to shock him and he "couldn't do anything and was paralyzed." (Zann Dep. at 53.) Zann stated that "[w]hen it would quit doing its tasing he would

25

step back and kick me and wait for the taser to build  back up charge . . . .  And I noticed that as soon as the kicking stopped that is when the tasing started back." (Id. at 55.)  Zann firmly testified that he did not try to get up at any time after being tased, stating that "there's no possible way." (Id. at 57.)  This testimony directly contradicts Deputy Whidby's testimony that Zann tried to get up and reach for the Deputy's leg after being tased the first and the second time.

Plaintiff's allegations related to the use of the taser in at least the second and third instance, while being kicked, and the use of the pepper spray as he lay motionless on the ground, raise serious questions about the force that was used against him during his arrest.  While the court recognizes that the facts at trial may turn out differently than the facts presented on summary judgment, the court must take Plaintiff's versions of the facts are true at this stage.  On Plaintiff's facts, Deputy Whidby violated his constitutional right by shocking him a second and third time with the taser, kicking him, and using the pepper spray while he was laying motionless and paralyzed, non-resisting on the ground.

## 2.  Was the Right Clearly Established?

Even though the actions of Deputy Whidby violated the Constitution, on the facts presented at summary judgment, the court also must ask whether Zann has shown that the right violated was clearly established at the time of the violation.

26

Pearson, 129 S. Ct. at 814-15.  The Supreme Court has declared that the inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition."  Id.  The relevant inquiry to determine whether a right is clearly established is to ask whether it would be "sufficiently clear that a reasonable officer would understand that what he is doing violates that right."  Wilson v. Layne, 526 U.S. 603, 615 (1999) (internal quotation marks and citation omitted).

To determine whether a right is clearly established, the courts look to the precedent of the Supreme Court of the United States, the Eleventh Circuit's precedent, and the pertinent state's supreme court precedent (here Alabama), interpreting and applying the law in similar circumstances.  McClish v. Nugent, 483 F.3d 1231, 1237 (11th Cir. 2007).  The Eleventh Circuit has "said many times that 'if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant.'"  Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 926 (11th Cir. 2000) (quoting Smith v. Mattox, 127 F.3d 1416, 1419 (11th Cir. 1997)).  However, in some cases, we may find that the right is clearly established, even in the absence of case law. One such instance is where the case is one of "obvious clarity"—i.e., where the officer's conduct "lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [the official], notwithstanding the lack of fact-specific case law"

on point.  Vinyard v. Wilson, 311 F.3d 1340, 1355 (11th Cir. 2002) (quoting Lee, 284 F.3d at 1199). Under this test, "the law is clearly established, and qualified immunity can be overcome, only if the standards set forth in Graham and our own case law inevitably lead every reasonable officer in [the defendant's] position to conclude the force was unlawful." Lee, 284 F.3d at 1199 (internal quotation marks omitted).

Zann did not present a case from the United States Supreme Court, the Eleventh Circuit, or from the Alabama Supreme Court, that clearly established that an officer's repeated used of a taser, while kicking the subject on the ground, and then using pepper spray constituted excessive force under circumstances like these.  The question, therefore, becomes whether it would be clear to every reasonable officer, even in the absence of case law, that the force used –  tasing Zann two times, kicking him, and emptying an entire can of pepper spray in his face while he lay motionless on the ground –  was excessive under the circumstances.

Under the facts, as presented by Zann, the court concludes that the force employed by Deputy Whidby was disproportionate to the level of force reasonably necessary that any reasonable officer would have recognized that his actions were unlawful.  After the initial taser shock, the need for force was exceedingly limited, as Zann testified that he was paralyzed and could not move at all.  Although Zann did run away from Deputy Whidby and attempted to enter an apartment that Deputy

Whidby did not know was Zann's, those actions may have justified the first taser shock – they did not justify the use of two additional taser shocks, repeated kicking and use of pepper spray as Zann lay motionless, not resisting, on the ground of the apartment complex. These later actions were unnecessary and disproportionate that no reasonable officer could have thought this amount of force was legal under the circumstances. When measured against these facts, as presented and accepted at the summary judgment stge, Deputy Whidby violated a clearly established right. Therefore, Deputy Whidby is not entitled to qualified immunity and summary judgment is not proper on Zann's claim of excessive force.

## V.  Conclusion

In conclusion, summary judgment is due to be granted as to Zann's claim of conspiracy under 42 U.S.C. § 1985 and Zann's claim of false arrest under 42 U.S.C. § 1983. Because material questions of fact exist regarding Zann's claim of excessive force under 42 U.S.C. § 1983, summary judgment is due to be denied as to this claim. A separate order will be entered.

**DONE** this the   24th   day of October, 2012.

James H. Hancock

SENIOR UNITED STATES DISTRICT JUDGE